# In the United States Court of Federal Claims

No. 14-346C

(Filed Under Seal: June 27, 2014 | Reissued: July 21, 2014)[*]

| | |
|---|---|
| SCIENCE AND MANAGEMENT RESOURCES, INC., | Post-award Bid Protest; Best-Value Negotiated Procurement conducted under FAR Part 15; FAR 15.305; FAR 15.308 |
| Plaintiff, | Motion to Dismiss; RCFC 12(b)(1); Standing; Tradeoff. |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

*David Franklin Barton*, Gardner Law Firm, San Antonio, TX, for plaintiffs.

*Meen Geu Oh*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

**KAPLAN, Judge**.

This is a post-award bid protest arising out of the United States Air Force's Request for Proposals No. FA8125-13-R-0003 for a firm-fixed-price contract with labor-hour and cost-reimbursement components. The Air Force ("agency" or "the government") sought support and maintenance services for Test, Measurement, and Diagnostic Equipment ("TMD equipment") at its Precision Measurement Equipment Laboratory ("PME lab") at Tinker Air Force Base, Oklahoma ("Tinker AFB"). The procurement was subject to the Federal Acquisition Regulations ("FAR"), 48 C.F.R. Part 15.

The plaintiff in this case is the incumbent contractor, Science and Management Resources ("SMR"). SMR challenges the contract award to Goldbelt Falcon, LLC ("Goldbelt"), contending that the award decision was arbitrary and capricious, inconsistent with the terms of the solicitation, and in violation of applicable procurement regulations. SMR seeks, among other things, a permanent injunction against the agency proceeding with the award of the contract to Goldbelt, cancellation of the award to Goldbelt, and the issuance of a new solicitation. Alternatively, SMR seeks to have the agency reevaluate the bidders in what it argues is a manner

---

[*]This Opinion was originally issued under seal, and the parties were given the opportunity to request redactions. In light of the parties' suggested redactions, filed on July 10, 2014, the opinion is now reissued with redactions indicated by brackets.

consistent with the evaluation criteria stated in the RFP and award the contract consistent with statute and regulation and in accordance with FAR 218, if necessary.  SMR also seeks reimbursement of its costs of pursuing this protest, including reasonable attorney's fees.

Pending before the Court are the parties' cross motions for judgment on the administrative record.  The government has also filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Rules of the Court of Federal Claims ("RCFC") 12(b)(1), claiming that SMR lacks standing to pursue this bid protest.

The Court held oral argument on the motions on June 10, 2014.  For the reasons explained below, the government's motion to dismiss for lack of subject matter jurisdiction is **DENIED**; the plaintiff's motion for judgment on the administrative record is **DENIED**; and the government's cross-motion for judgment on the administrative record is **GRANTED**.

## BACKGROUND[1]

### I.    The Contract Solicitation and Evaluation Criteria

As noted above, on March 22, 2013, the Air Force issued Request for Proposals ("RFP" or "solicitation") No. FA8125-13-R-0003 for a firm-fixed-price contract with labor-hour and cost-reimbursement components.  AR 11:240; AR 25:685.[2]  The solicitation sought a service provider to maintain and repair TMD equipment at Tinker AFB's PME lab[3] and called for a thirty-day phase-in period, followed by an eleven-month base period, two one-year option periods, and another option for a six-month extension period.  AR 14:473.  The solicitation included Section L "Instructions to Offerors," AR 11:295-318, Section M "Evaluation Factors for Award," AR 14:465-476, and the Performance Work Statement, AR 14:429-464.

According to the solicitation, the Air Force would award the contract to the offeror that provided the best value to the government, utilizing tradeoff source selection procedures.  AR 14:475.  In evaluating proposals, the solicitation provided that an "[a]ward will be made to the

---

[1] The background constitutes findings of fact made by the Court from the administrative record of the procurement filed pursuant to RCFC 52.1(a).  See Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (observing that bid protests "provide for trial on a paper record, allowing fact-finding by the trial court").

[2] Citations to the administrative record refer to the amended record filed on May 23, 2014.  The record is paginated sequentially and also divided into tabs.  In citing to the administrative record, the Court will designate the tab, followed by page number.  For example, AR 11:240 refers to page 240, which is located in Tab 11.

[3] Air Force Instruction 21-113, entitled Air Force Metrology and Calibration (AFMETCAL) Management, requires the Air Force to abide by strict guidelines in maintaining and supporting TMD equipment and personnel in Air Force PME labs (specialized laboratories used to test and to calibrate equipment used in support of aircraft maintenance).  AR 8:60; AR 14:434.

offeror proposing the combination of factors most advantageous to the [g]overnment based upon an integrated assessment of the evaluation factors." AR 14:466, ¶ 2.1.1.

Section M of the RFP identified the three evaluation factors that would be used to determine the award:  (1) Technical, (2) Past Performance, and (3) Cost/Price.  AR 14:466, ¶ 2.1.1.  The technical evaluation factor comprised three subfactors: (1) Quality, (2) Program Management, and (3) Production Function.  Id.

Under the technical evaluation factor, the RFP provided that the government would evaluate the offeror's ability to "ensure[ that] Air Force Metrology and Calibration (AFMETCAL) program laboratory certification requirements are met," provide "[q]uality personnel," make available a "sufficient number of personnel to meet all workload requirements," and provide a plan for "status control accuracy and maintaining follow up actions." AR 14:467-68, ¶ 2.2.  The RFP required the Air Force to evaluate an offeror's compliance with the technical factor on a pass/fail basis.  AR 14:466, ¶ 2.1.3.  Furthermore, it stated that proposals shall be evaluated against the criteria listed in the solicitation.  Id.  Section L also stated that offeror's "responses will be evaluated against the [t]echnical subfactors defined in Section M." AR 11:300, ¶ 3.1.  If an aspect of an offeror's proposal was deemed unacceptable, the Air Force stated it would, within its sole discretion, consider the "correction potential" of the proposal.  AR 14:465, ¶ 1.3.

The RFP further provided that the evaluation of past performance would be based on information gathered from Past Performance Questionnaires ("PPQs"), the Past Performance Information Retrieval System ("PPIRS"), Contractor Performance Assessment Reports ("CPAR"), and interviews with government customers and clients.  AR 14:470-71, ¶ 2.3.2.3.  The Air Force stated that it would evaluate the past performance information and attribute a corresponding weight to the information based on relevancy, with each point of reference receiving a rating of "Very Relevant," "Relevant," Somewhat Relevant," or "Not Relevant."  AR 14:469-70, ¶ 2.3.2.2.  More relevant performance would have a greater impact on the performance confidence assessment than less relevant performance.  AR 14:469, ¶ 2.3.2.  As part of the analysis, the Air Force would also consider the relevancy of the previously performed contracts in light of the solicitation's technical criteria and the comparability of the cost/price of the previous contract to this contract.  AR 14:469, ¶ 2.3.2.2.  In addition, past performance relevant to the technical subfactors would be further rated based on a performance quality assessment.  Id.  Possible ratings ranged from "Exceptional" (the highest) to "Very Good," "Satisfactory, Marginal," "Unsatisfactory," or "Unknown."  AR 14:470-72, ¶ 2.3.2.3.  The solicitation further provided that offerors receiving an "Unknown" rating "will not be evaluated favorably or unfavorably on past performance."  AR 14:472, ¶ 2.3.3.

The solicitation stated that, after a full analysis of the relevant data, the Air Force would assign to each offeror an overall performance confidence assessment of "Substantial Confidence" (the highest rating), "Satisfactory Confidence," "Limited Confidence," "No Confidence," or "Unknown Confidence" (reserved for when "the offeror's performance record is so sparse that no meaningful confidence assessment can be reasonably assigned.").  AR14:468, ¶ 2.3.1.  An offeror received a rating of Substantial Confidence if "based on [its] recent/relevant performance record, the [g]overnment [had] a high expectation that the offeror [would]

successfully perform the required effort."  Id.  The solicitation also stated that "[a]ll offerors rated as Substantial Confidence [would] be considered equal" under the past performance evaluation factor.  Id.

Regarding the cost/price evaluation factor, the solicitation informed offerors that the Air Force would conduct a price reasonableness analysis, as defined in FAR 15.404-1, of the Total Evaluated Price (TEP) of each offeror.  AR 14:472-73, ¶¶ 2.4.1, 2.4.4.  As part of this analysis, the solicitation informed offerors that the "TEP will be calculated as the sum of the offeror's proposed prices for one thirty day phase-in period, one eleven-month base period, two one-year options and one six-month extension."  AR 14:473, ¶ 2.4.4.  The solicitation also stated that the "six-month extension . . . will be [calculated] based on the proposed Option II unit pricing."  Id.  The solicitation explained that the Air Force would review offerors' proposals for unbalanced pricing—that is, whether prices were unbalanced with respect to similar pricing across the period of performance.  AR 14:472-73, ¶ 2.4.2.  Further, the Air Force stated that it would evaluate each offeror's cost breakdown for reasonableness.  AR 14:472, ¶ 2.4.1.

In describing the relative importance of the factors, the solicitation stated that "technical acceptability is a prerequisite to the tradeoff between Cost/Price and Past Performance."  AR 14:466, ¶ 2.1.2 (emphasis omitted).  Factor 2, past performance, would be considered more important than Factor 3, cost/price.  Id.  Only after a proposal was deemed technically acceptable would the Air Force conduct a tradeoff analysis, if necessary, between the offeror's past performance and its proposed cost/price.  Id.; AR 14:475-76, ¶ 3.0.  The solicitation provided that cost/price would "contribute substantially to the award decision."  AR 14:466, ¶ 2.1.2.

All factors were to be evaluated concurrently.  AR 14:466, ¶ 2.1.3.  The Air Force initially stated that it intended to award the contract without discussions, but it reserved the right to conduct discussions if necessary.  AR 14:476, ¶ 3.1.  If discussions were conducted, then the "[o]fferor responses to Evaluation Notices (ENs), and the Final Proposal Revision (FPR) will be considered in making the [source selection] decision."  Id.

## II.    Assessment of the Proposals

Goldbelt, SMR, ["Offeror A"], ["Offeror B"], and ["Offeror C"] timely submitted proposals in response to the solicitation.  AR 22:639.  The Air Force Source Selection Evaluation Board ("SSEB") then made an initial evaluation of the technical and past performance factors of each proposal.  AR 23:666.  All of the offerors were rated technically unacceptable for one or more subfactors; and therefore, the offerors were deemed technically unacceptable in this initial evaluation.  See generally AR 23:667.

On May 23, 2013, the SSEB briefed the Source Selection Authority ("SSA" or "contracting officer") on its results and recommended that all offerors except [Offeror B] remain in the competitive range.  AR 23:666.  The SSA approved the SSEB's recommendation to remove Offeror B from the competitive range because its proposal was deemed unacceptable on too many levels and would need significant rewriting to be competitive.  AR 23:666.  The SSA then opened discussions with the remaining offerors.  Id.  The offerors received, in two rounds of

4

discussions, the following Evaluation Notices (ENs):  Goldbelt – [. . .]; SMR – [. . .]; Offeror A – [. . .]; Offeror C – [. . .].  Id.

Each offeror provided responses to the agency's clarification requests and evaluation notices, and ultimately, each offeror was deemed technically acceptable and received a past performance rating of Substantial Confidence.  AR 23:668.  Because the offerors all received a past performance rating of Substantial Confidence, consistent with the solicitation, they were all deemed equal under the past performance factor, and no tradeoff analysis was conducted.  Id. The SSEB recommended that the contract be awarded to Goldbelt based on the fact that its proposed price of $12,215,782.94 was the lowest price.  Id.

On February 3, 2014, the Air Force awarded the contract to Goldbelt.  AR 26:725. Offeror A and SMR were, respectively, the presumptive second and third-place finishers.  AR 22:662.  Offeror A proposed a price of $[. . .], approximately $[. . .] higher than Goldbelt's proposed price.  Id.  SMR's proposed price of $[. . .] exceeded Offeror A's proposed price by nearly $[. . .].  AR 22:662; AR 24:680.

III.    SMR's Protest

    A.    The GAO Decision.

Following a debriefing, SMR filed a bid protest at the Government Accountability Office (GAO) alleging that (1) the agency's price analysis was flawed due to an unclear technical requirement in the Performance Work Statement; (2) the agency's price analysis was flawed due to an inaccurate best estimated quantity; (3) the lack of experience of the final technical review team resulted in an improper price evaluation; and (4) the Air Force improperly converted the basis of the award from a best value procurement process to a lowest value technically acceptable process in failing to conduct a tradeoff analysis between the past performance and cost/price factors as required by the RFP.  AR 40:976-77.  On April 10, 2014, the GAO dismissed the protest, concluding that SMR had abandoned issues (1), (2), and (3) because it failed to provide a substantive response to the agency's report addressing these issues.  AR 40:976.  As to issue (4), the GAO held that the evaluation process used in awarding the contract to Goldbelt complied with the RFP.  AR 40:978.  To the extent that SMR was challenging the RFP's evaluation scheme, the GAO concluded its argument was untimely based on 4 C.F.R. § 21.2(a)(1).  Id.

    B.    The Present Lawsuit.

Following the GAO's decision, SMR filed its bid protest in this Court on April 25, 2014 alleging in two counts that the agency's decision was arbitrary and capricious and contrary to law.  The Court held a status conference on April 29, 2014.  Based on the Court's assurance that it would rule on cross motions for judgment on the Administrative Record no later than June 27, 2014, the government agreed to stay proceedings in the procurement pending a decision from the Court.

5

**DISCUSSION**

**I.  Jurisdiction**

The government has moved to dismiss this case under RCFC 12(b)(1), arguing that the Court lacks subject matter jurisdiction because the plaintiff does not have standing to pursue its protest.  Def.'s Mot. 10, ECF No. 25.  The standards for ruling on a motion to dismiss are well established.  Plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013).  In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the pleadings and draws all reasonable inferences in favor of the plaintiff.  Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).

The Court of Federal Claims has jurisdiction over actions "by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b) (2006).  A party is an "interested party" and therefore has standing if the party "is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract."  Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013).

A bidder has a direct economic interest if it suffered a competitive injury or prejudice.  Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing").  In a post award bid protest, the bidder has suffered prejudice if it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process."  Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  See also Weeks Marine Inc., v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009); Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006).  "In other words, the protestor's chance of securing the award must not have been insubstantial."  Info. Tech., 316 F.3d at 1319.

It is well established that a plaintiff's standing for Article III purposes is determined on the basis of the allegations in its complaint and not on the basis of their ultimate merits.  Warth v. Seldin, 422 U.S. 490, 500 (1975) (noting that the threshold inquiry into standing "in no way depends on the merits of the [petitioner's] contention that particular conduct is illegal").  This principle has been consistently applied to determine whether a plaintiff has standing in a bid protest case.  See, e.g., Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-95 (2010) (distinguishing between the prejudice required to establish standing and the prejudice required to succeed on the merits).  As the court observed in Magnum Opus Techs. Inc. v. United States, "[i]n a post-award bid protest, before reaching the merits of the parties' dispute, the court conducts only a 'limited review' of the plaintiff's allegations and the administrative record for the 'minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing.'"  94 Fed. Cl. 512, 530 n.12 (2010) (citations omitted).  "This approach 'avoid[s] examining the parties' arguments on the merits in order to resolve standing.'"  Id. (quoting Textron, Inc. v. United States, 74 Fed. Cl. 277, 285 (2006)).

Here, regardless of their ultimate merits, SMR's allegations are sufficient to establish its standing. SMR alleges that there were systemic defects in the evaluation process and inadequacies in the administrative record that underlie the award. Among other things, SMR alleges that the government fails to explain or substantiate its decision to rate the Past Performance of Goldbelt and the other offerors at the "Substantial Confidence" level. Pl.'s Mot. 11, ECF No. 21. It also contends that there is insufficient explanation in the record to justify rating Goldbelt's final proposal or that of the other offerors technically acceptable. Id. at 10. In addition, SMR argues that there is insufficient discussion in the administrative record of the strengths or weaknesses of any offeror's approach regarding any technical subfactor, which it claims violates FAR 15.305(a). Id. at 15. SMR also alleges that the agency failed to utilize a tradeoff source selection procedure, thus departing from the evaluation procedure stated in the RFP. Id. at 14.

In this case, if SMR's allegations were found meritorious, then "all of the agency's ratings would need to be redone, and a new best value determination made." Preferred Sys. Solutions v. United States, 110 Fed. Cl. 48, 57 (2013). In that light, the Court finds unpersuasive the government's argument that SMR lacks standing because another bidder (Offeror A) was next in line for the award based on its price. Def.'s Mot. 11-13, ECF No. 25.[4] For one thing, it is not entirely clear which of the bidders would be next in line if the agency were required to redo the entire evaluation process to correct the errors that the plaintiff alleges were committed. And, in any event, a bidder need not be next in line for the consideration of an award in order to possess standing; the "substantial chance" requirement is met where, "but for the government's alleged error, the protestor would have been 'within the zone of active consideration.'" Preferred Sys. Solutions, 110 Fed. Cl. at 57 (quoting Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. 16, 37 (2010), aff'd, 649 F.3d 1320 (Fed. Cir. 2011)).

In this case, there is little question that SMR would have been within the "zone of active consideration" were it not for the alleged errors in the evaluation process. Indeed, SMR is the incumbent contractor and was a finalist for the contract award. Because SMR's chance of securing the award upon a new evaluation of the bidders' proposals would not be "insubstantial" (Info Tech., 316 F.3d at 1319) the jurisdictional requirement that SMR establish its standing has been met. Therefore, the government's motion to dismiss for lack of subject matter jurisdiction is, accordingly, **DENIED**.

## II.  Merits

### A.  Standard of Review

The Court reviews challenges to a contract award under the same standards used to evaluate agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) ("[I]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). To successfully challenge an agency's procurement decision, plaintiff must show that the agency's decision was

---

[4] As the government points out, Offeror A had the same rating as SMR on both the technical and past performance factors, but a lower total evaluated price. Id. at 13.

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); Bannum, Inc., 404 F.3d at 1351.  "The arbitrary and capricious standard applicable here is highly deferential.  This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).

The disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis.  Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1338 (Fed. Cir. 2001).   Indeed, such a challenge can succeed only if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Ala. Aircraft Indus., Inc.–Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alterations in original) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co. ("State Farm"), 463 U.S. 29, 43 (1983)).  Where the contract award is based on a best value determination, the agency is entitled to "even greater discretion than if the contract were to have been awarded on the basis of cost alone."  Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004).

The Court is particularly deferential to the agency's technical evaluation.  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (stating that "such matters as technical ratings" involve "the minutiae of the procurement process . . . that a court will not second guess").  "This is because the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations."  One Largo Metro, LLC v. United States, 109 Fed. Cl. 39, 74 (2013) (alteration and internal quotations marks omitted) (quoting Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2009)).

Given this highly deferential standard of review, the court's job is to "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  Impresa, 238 F.3d at 1332-33 (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)).  The agency need only articulate a "rational connection between the facts found and the choice made," and the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  State Farm, 463 U.S. at 43.

**B. The Government's Decision to Award the Contract to Goldbelt Was Not Arbitrary and Capricious or Contrary to Law.**

    **1.  The Agency's Technical Evaluation Was Rationally Based and Sufficiently Documented.**

SMR protests the technical evaluation of Goldbelt and the other offerors on the grounds that (1) Goldbelt did not submit a quality control plan; (2) the Air Force did not explain its decision to deem Goldbelt's proposal technically acceptable; and (3) the Air Force did not explain how technical acceptability ratings were ultimately made or document the strengths,

weaknesses, and risks of SMR's proposal as compared to Goldbelt's. Pl. Mot. 9-14. According to SMR, "[t]he [a]gency's evaluation of the technical provisions of Goldbelt's Final Proposal consists of cursory statements that the proposal is acceptable for each of the technical subfactors without explaining any strengths or weaknesses of the proposal or recognizing that Goldbelt's Quality Control Plan was not included in the proposal." Id. at 9-10. For the reasons set forth below, these contentions are meritless.

### a. Goldbelt Included a Quality Control Plan in Its Proposal.

SMR's argument that Goldbelt's final proposal did not include a Quality Control Plan as required by the solicitation lacks merit. Although the administrative record that the government initially filed did not reflect the inclusion of the plan, the Court granted the government's motion to amend the record, Def.'s Mot. Amend AR, ECF No. 22, based on the Court's conclusion that the plan was, in fact, considered by the Air Force. Order, ECF No. 31. The Court so concluded based on the sworn affidavit of the contracting officer submitted in conjunction with the government's motion to amend the record, Rust Decl., Def.'s Mot. Amend AR 4, and the evidence in the rest of the administrative record showing that such a plan was submitted.

Indeed, the administrative record contains ample evidence that the government considered Goldbelt's Quality Control Program, which included the Quality Control Plan, in reviewing Goldbelt's proposal for compliance with the solicitation's technical requirements. First, Volume I of Goldbelt's initial proposal referenced the Quality Control Plan as Attachment 1 of Volume IV. See AR 60:1688, 1711, 1727, 1733; AR 71:2510. Second, the government issued Goldbelt EN # [. . .] to solicit additional information concerning Goldbelt's [. . .]. AR 65:2477-478; AR 74:3120-126; see also AR 25:694-96, 702. These were topics discussed in Goldbelt's Quality Control Plan. AR 159:3827-3848. The agency's consideration of the plan is also reflected in its notification to Goldbelt that [. . .]. AR 65:2477.[5] Similarly, on June 10, 2013, the Air Force requested further information, EN # [. . .], on Goldbelt's quality program concerning language used in a data table. AR 99:3531; AR 74:3120-126; see also AR 25:694-702.[6] Goldbelt responded to all of the agency's ENs. AR 109:3550-AR 112:3565; AR 74:3120-126. Accordingly, the Court remains satisfied that Goldbelt included a Quality Control Plan in its final proposal and is further satisfied that the agency reviewed Goldbelt's Quality Control Plan in connection with its assessment of Goldbelt's compliance with the technical requirements.

### b. The Record Supports the Decision to Rate Goldbelt's Proposal Technically Acceptable.

SMR next contends that the government did not adequately explain why the initial proposals were deemed technically unacceptable or why each offeror's rating, especially Goldbelt's, was changed from unacceptable to acceptable after its responses to the agency's Evaluation Notices. This argument is meritless.

---

[5] Goldbelt was asked to respond to all of these concerns by June 4, 2013. AR 65:2478.

[6] According to that EN, although Goldbelt had responded to the agency's earlier concerns, this had resulted in an [. . .]. [. . .] was not reflected in Figure 1 of Goldbelt's response. AR 99:3531.

As noted above, an agency need only articulate a "rational connection between the facts found and the choice made"; even "a decision of less than ideal clarity" will be upheld "if the agency's path may reasonably be discerned." State Farm, 463 U.S. at 43. That standard is easily met here. The record reflects that the proposals were deemed technically acceptable only after the agency engaged in extensive discussions with the offerors about their proposals. See AR 17:486-91; AR 65:2477-AR 67:2494; AR 109:3550-AR 112:3565; AR 121:3594-AR 125:3606; AR 137:3698-AR 138:3705; see also AR 16:479-85; AR 74:3120-AR 76:3141. The evaluation notices issued to each offeror provide a rational explanation of why the initial proposals were technically unacceptable. See AR 109:3550-AR 112:3563; AR 121:3594-AR125:3605; AR 137:3698-AR 138:3705; AR 149:3798-AR 151:3809. Further, the record reflects an adequate basis for the agency's ultimate decision that the proposals were all technically acceptable based on additional information supplied by the bidders. Id.

For example, the government initially questioned Goldbelt's [. . .]—three technical evaluation subfactors. AR 65:2477-82. Within a week, Goldbelt addressed the agency's inquiries by [. . .]. AR 74:3120-3126; AR 109:3550-AR 111-3562. In a second round of inquiries, the government asked Goldbelt to explain a number contained in a data table in Goldbelt's technical proposal. Goldbelt stated it was a typographical error and corrected the number. AR 99:3531-32, AR 112:3563-3565; AR 74:3120-3126. Moreover, Goldbelt applied these discussions in its Final Proposal. AR 71:2516, 2590-91, 2647.

As indicated in the final evaluation section of the Technical Worksheet, Goldbelt's modifications to its initial proposal led the technical team to rate Goldbelt's proposed approach as "acceptable" for each technical subfactor. See AR 74. For example, in regard to subfactor 1a, the team agreed that Goldbelt's proposal showed "a clear understanding of the requirements as outlined." AR 74:3120. "The proposal included a detailed description of their self-inspection process, management reviews and a method to ensure continued compliance." AR 74:3125. As to subfactor 1b, the technical worksheet states that Goldbelt "clearly [met] subfactor 1b." Id. The team found that Goldbelt "sufficiently incorporated [. . .] into the final proposal." Id. As to subfactor 2, the technical team concluded that Goldbelt "sufficiently incorporated [. . .]" AR 74:3126.

There is similarly no merit to SMR's argument that Goldbelt did not show it could meet the solicitation's requirement of a 98% TMD equipment availability rate. Pl.'s Mot. 10. Goldbelt addressed this issue in its proposal. AR 71:2562-84. Goldbelt's response was deemed technically acceptable by the technical evaluation team after the initial proposals were submitted. AR 74:3122. According to the review team, Goldbelt "outlined a plan to monitor the rate through [. . .] to control availability rate. The proposal also listed corrective measures to be taken in the event the proactive measures are ineffective." Id. As to subfactor 3b, the team concluded that Goldbelt "outlined a detailed status control plan that proposes to identify root causes of production delays in daily production meetings, document proposed corrective actions, and analyze the effectiveness of corrective actions." Id. As previously stated, the evaluation team found Goldbelt's response to be acceptable.

It bears noting again that deference to the judgment of the evaluators is warranted here and that it is not within the Court's purview to get in the proverbial "weeds" regarding the evaluation process. See E.W. Bliss Co., 77 F.3d at 1367 (stating that "such matters as technical ratings" involve "the minutiae of the procurement process . . . that a court will not second guess"); see also Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014) (stating that "[t]he deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation"). Accordingly, SMR's challenge to the adequacy of the agency's findings with respect to offerors' compliance with the technical requirements of the solicitation provides no basis for disturbing the contract award.

### c.   The Agency Did Not Violate FAR 15.305 or FAR 15.308 in Its Technical Evaluation of the Proposals.

Finally, there is no merit to SMR's contention that the award violated applicable regulations because the government did not adequately explain or compare the strengths and weaknesses of each offeror's technical proposal as required by FAR 15.305 and FAR 15.308.[7] See Pl.'s Resp. 19-23 (contending that "the Agency failed to articulate the specific advantages that made one proposal of higher quality than another"). First, as described above, the record contains ample documentation of the agency's technical evaluation of the proposals. In fact, this information is all consolidated in the document titled "Proposal Analysis Report," which details the evaluation of all the proposals. AR 25:685-724. The report includes a narrative with notation of ratings assigned to each offeror and describes the reasons the evaluators assigned such ratings to each offeror. Id.

Second, FAR 15.305 and FAR 15.308 must be read in light of the requirements of the solicitation. The solicitation stated that "the proposals shall be evaluated against the [technical] criteria" listed in the solicitation and "on a pass/fail basis, assigning ratings of Acceptable, or Unacceptable" to each proposal. AR 14:466 (emphasis added). A proposal would be rated acceptable if it clearly met the minimum requirements of the solicitation and unacceptable if it did not clearly meet the minimum requirements of the solicitation. AR 14:467, ¶ 2.2. Therefore, under this approach, what matters is only whether the offeror's proposal meets this minimum benchmark listed in the solicitation, not its relative strengths, deficiencies, weaknesses, and risks from a technical standpoint. Given this methodology, there would be no reason to perform any comparative examination of the strengths, weaknesses, and risks of competing proposals; it is sufficient that the record fully shows that the agency followed the evaluation scheme in the

---

[7] The FAR requires the Air Force to "evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation" and document in the contract file "[t]he relative strengths, deficiencies, significant weaknesses, and risks" of each proposal to support its evaluation. FAR 15.305(a). The agency's final award decision must "be based on a comparative assessment of proposals against all source selection criteria in the solicitation." FAR 15.308. The Air Force must document its decision, and its documentation must "include the rationale for any business judgments and tradeoffs made or relied on by the [source selection authority], including benefits associated with additional costs." Id.

solicitation and fully supports the agency's conclusions that each offeror met the solicitation's technical requirement.[8]

### 2. The Agency's Past Performance Evaluation Was Rationally Based and Sufficiently Documented.

SMR contends that Goldbelt's Past Performance rating was unsupported and unjustified. Pl.'s Mot. 10-11. It argues that the reviews of Goldbelt's past performance were incomplete and did not include relevant information such as Goldbelt's ability to meet the TMD equipment availability rate, maintain accurate status control, ensure all documents meet requirements, and maintain calibration tech data. Id. These contentions also lack merit.

In reviewing an evaluation of past performance, "the greatest deference possible is given to the agency.'" See Gulf Grp. Inc. v. United States, 61 Fed. Cl. 338, 351 (2004); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 910 (Fed. Cir. 2013) (agencies afforded "broad discretion" in past performance evaluations). "[I]t is important to note that what does or does not constitute 'relevant' past performance falls within the [Source Selection Authority's] considered discretion." PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 539 (2010). "[E]valuation of experience and past performance, by its very nature, is subjective . . . and an offeror's mere disagreement with an agency's evaluation judgments does not demonstrate that those judgments are unreasonable." Glenn Def. Marine-Asia PTE, Ltd., B-402687.6 et al. 2012 CPD ¶ 3 (Comp. Gen. Oct. 13, 2011).

In this case, the basis for the ratings of Substantial Confidence for each of the offeror's past performance is well documented in the Proposal Analysis Report, and the agency's conclusions are reasonable and consistent with the criteria in the solicitation. AR 25:696-700, 704-07, 712-14, 718-21. The Air Force considered the relevancy of the offerors' previously performed contracts in light of the solicitation's technical criteria and the comparability of the cost/price of the previous contract to this solicitation. See generally id. In addition, past performance relevant to the solicitation's technical subfactors were further rated based on a performance quality assessment. Id. During this process, the Air Force issued five past performance evaluation notices to [. . .] of the four offerors. AR 23:666. For example, Goldbelt was asked to clarify [. . .]. AR 97:3528. Offeror A on the other hand did not receive any past performance evaluation notices. AR 25:714. It submitted only one previous contract, worth $[. . .], for review. AR 83:3207-17; AR 86:3280-83; AR 90:3394-3404; AR 94:3504-10. Based on the PPIS, PPQs, and CPARs, the review team considered the contract Very Relevant and gave Offeror A an overall performance quality rating of Satisfactory. AR 25:713. The contract was also considered Very Relevant for subfactors 1 and 2 and Relevant for subfactor 3 in the Solicitation. Id. Moreover, the team rated Offeror A's performance quality assessment for each subfactor as Very Good. Id. Only after this analysis was Offeror A assigned an overall

---

[8] For these reasons, SMR's reliance on Metcalf Constr. Co., Inc. v. United States, 53 Fed. Cl. 617 (Fed. Cl. 2002) is misplaced. In that case, the technical acceptability rating scheme was not a pass/fail system; instead, the technical ratings ranged from Highly Acceptable to Unacceptable. Id. at 624.

performance confidence assessment of "Substantial Confidence."  AR 25:714.

Goldbelt, in particular, was actually evaluated on the basis of more information than was SMR.  Goldbelt submitted for evaluation [. . .] previously performed contracts, worth on average $[. . .].  AR 25:697-98.  See also AR 80:3146-86; AR 92:3412-67.  In contrast, SMR submitted [. . .] contracts, worth on average $[. . .].  AR 25:705-06.  See also AR 81:3187-3203; AR 82:3204-06; AR 93:3468-3503.  For Goldbelt's [. . .] contracts, the Air Force received [. . .] PPQs and [. . .] CPARs.  See AR 84:3233-58; AR 88:3297-3349.  By comparison, for SMR, the agency received [. . .] PPQs and [. . .] CPARs.  See AR 85:3258-79; AR 89:3350-93.

Thus, Goldbelt not only submitted the greatest number of previously performed contracts for evaluation, but Goldbelt's contracts also provided the Air Force with the largest number of relevant, comparative reference points (Relevant or Very Relevant ratings), and the largest number of positive ratings (Very Good or Exceptional ratings).  See AR 25:696-700, 704-07.  In all, Goldbelt's past performance information generated [. . .] Relevant or Very Relevant comparative references and resulted in [. . .] Very Good or Exceptional ratings, [. . .] Satisfactory ratings, and [. . .] Unsatisfactory ratings.  AR 25:696-700.  In comparison, SMR's past performance information resulted in [. . .] Relevant or Very Relevant comparative references, [. . .] Very Good or Exceptional ratings, [. . .] Satisfactory ratings, and [. . .] Unsatisfactory ratings.  AR 25:704-07.

To the extent that SMR is arguing that Goldbelt should have been rated lower than Substantial Confidence for its past performance because it received several "Unknown" performance quality ratings, that argument is without merit.  The solicitation stated that offerors receiving an "Unknown" rating "will not be evaluated favorably or unfavorably on past performance."  AR 14:472, ¶ 2.3.3.  Further, as noted, the proper weighing of factors and rating of the performance of the offerors is a decision that is left to the agency's discretion.  SMR has not provided an adequate justification for the Court to second guess the agency's judgment on these matters here.

In short, the Court finds that the agency provided a coherent and reasonable explanation of the exercise of its discretion regarding the performance ratings assigned to the offerors.  SMR's challenge to this aspect of the agency's determination is, accordingly, rejected.

### 3.    The Air Force Evaluation of the Cost/Price Factor Was Rationally Based and Sufficiently Documented.

SMR makes several allegations concerning the agency's evaluation of the offerors' cost/price proposals, including alleging that (1) the Air Force overlooked a lack of change in price even though Goldbelt added "additional personnel"; (2) the Air Force did not scrutinize Goldbelt's omission of Emergency Service and Emergency Custodial Service costs in its price proposal; and (3) the Air Force awarded the contract to Goldbelt based on a Total Evaluated Price ("TEP") that excluded the six-month extension period.  Pl.'s Mot. 11-12.  The Court finds these allegations regarding the cost/price evaluation meritless.

First, Goldbelt's Final Proposal did account for [. . .].  Goldbelt's final price proposal states that "[i]n response to Technical Evaluation Notice [. . .] . . . . [Goldbelt] [. . .] in each lab [resulting in an] updated price proposal."  AR 71:2608, ¶ 3.14.1.  As reflected in Goldbelt's proposals, this change (among others) increased Goldbelt's proposed price by approximately $[. . .].  Compare AR 60:1847-51 with AR 71:2615-19.  See also AR 32:836-39 (initial price proposal equals $[. . .]); AR 25:701 (final price proposal equals $12,215,782.94); AR 23:667-68.[9]

Similarly, contrary to SMR's argument, no offeror was required to include a line item for overtime wages for emergency services (including custodial services) in their cost/price proposal.  SMR relies upon language in the Performance Work Statement which states that work identified by the government as "[e]mergency . . . shall be worked continuously around the clock (24/7) until completed."  AR 14:436, ¶ 1.10.1, 439, ¶ 1.14.8.1 ("Emergency requests shall be negotiated from the appropriate Over and Above line item.").  While the Performance Work Statement is a part of the solicitation, no offeror was obligated by either Section L or M to propose an estimated number of overtime hours (and corresponding overtime wages) in its cost/price proposal.  See generally AR 11:295-318; 14:413-476.  Further, the suggestion that "Emergency" tasks "must be worked continuously (24/7)" does not necessarily imply that overtime wages must be paid.  As the government illustrated in its brief, a contractor might decide to divide its labor force into three different eight-hour shifts, with each shift handing off existing work to the next shift.  Def.'s Mot. 22.  This arrangement would avoid any accrual of overtime wages without interrupting operations during normal business hours or otherwise.  Id.  Therefore, SMR's argument that overtime wages are required in cost/price proposals is meritless.

Finally, SMR argues that "the Agency awarded the contract to Goldbelt based on price factors less than the TEP," claiming that "the Agency excluded the price of the six month extension in violation of the Solicitation."  Pl.'s Mot. 12 (citing AR 24:684).  The record shows that this contention is meritless.  Each offeror's TEP was calculated based on the proposed costs for the phase-in work, the base period, two option years, and an optional six-month extension period.  AR 14:473, ¶ 2.4.4.; AR 23:667; AR 24:670-71; AR 25:701.

Further, the solicitation indicates that offerors were not required to include pricing for the six-month extension period because the Air Force intended to calculate that cost based on the proposed pricing for the second option year.  AR 14:473, ¶ 2.4.4 ("The six-month extension of services prices will be based on the proposed Option II unit pricing.").  The Air Force did precisely that, by taking Goldbelt's second option calculations to plug-in costs for the six-month extension period.  AR 25:692.  See generally, AR 24.

---

[9] SMR's contention that Goldbelt never changed its proposed price likely stems from the fact that the agency's price competition memorandum and its proposal analysis report did not include Goldbelt's initial proposed price for comparison and only noted Goldbelt's Pre-Final Proposal Revision price (or its intermediate price), which already included the price increase for the [. . .].  AR 24:670, 679; AR 25:700-01.  The very first page of Goldbelt's proposal (the cover letter) states that its final proposed price includes "updated pricing resulting from the Evaluation Notices (ENs)."  AR 71:2509.

In fact, the same protocol was followed for SMR's proposal.  SMR also did not provide a proposed cost for the six-month extension period in its proposal.  See generally AR 20:573-620.  The Air Force took SMR's second option period pricing and calculated the proposed cost for the six-month extension period, just as the solicitation required.  AR 24:670-71; AR 25:692,709.  The agency's application of its calculation for proposed pricing on the six-month extension period was consistent with respect to all offerors.  AR 24:670-71 (formula to determine proposed costs for each offeror's six-month extension period is taking the second option pricing and dividing by two).  SMR's challenge to this aspect of the agency's evaluation is, accordingly, rejected.

### 4.   There Is No Merit to SMR's Argument that the Agency Did Not Follow Applicable Tradeoff Source Selection Procedures.

Finally, SMR's argument that the Air Force violated the terms of the solicitation and applicable regulations by abandoning tradeoff source selection procedures—that is, the tradeoff between past performance and cost/price—in its award of the contract to Goldbelt, is without merit.   The solicitation explains that "[a]ll offerors rated as Substantial Confidence will be considered equal for Factor 2 Past Performance."   AR 14:468, ¶ 2.3.1.  Goldbelt, like SMR, received a Substantial Confidence rating.  The only material difference between the proposals was that Goldbelt's TEP was $[. . .] [. . .] than SMR's.  In a case like this one, where all offerors are rated as Substantial Confidence, a tradeoff analysis between past performance and cost/price is not possible.  See Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 265 (2011) (Because two offers were "essentially equal" the "lowest offered price was the determining factor for the award."); Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325, 349-50 (2009) (recognizing that when two proposals are technically equivalent, it is not possible to perform a tradeoff analysis).  The SSA's decision not to utilize the tradeoff between past performance and cost/price did not convert the procurement to a lowest price technically acceptable procurement.  Under the circumstances, SMR fails to show how the agency violated applicable regulations or the terms of the solicitation in making its best value determination.

### CONCLUSION

As described above, while SMR's allegations are sufficient to establish its standing, it has failed to establish their merit by showing any error, prejudicial or otherwise, in the procurement process.  Accordingly, the government's motion to dismiss is **DENIED**, but its cross motion for judgment on the administrative record is **GRANTED**.  The plaintiff's motion for judgment on the administrative record is **DENIED**.  The Clerk of the Court is directed to enter judgment accordingly.

Pursuant to the Court's April 30, 2014 Protective Order, this Opinion and Order has been issued under seal.  The parties shall have two weeks to propose redactions and, accordingly, shall file such proposed redactions on or before Friday, July 11, 2014.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge